54 So.2d 137

**STATE v. BENTLEY.**
No. 40325.

June 29, 1951.

Bernard Cunniffe, New Orleans, for appellant.

Bolivar E. Kemp, Jr., Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Severn T. Darden, Dist. Atty., Edward A. Haggerty, Jr., First Asst. Dist. Atty., Matthew S. Braniff, Asst. Dist. Atty., New Orleans, for appellee.

FOURNET, Chief Justice.

The defendant, Walter Bentley, is appealing from his conviction and sentence to death on an indictment charging him with the crime of aggravated rape, contending that the trial judge erred (1) in overruling his motion for the appointment of a lunacy commission to determine his mental condition at the time of the trial and also at the time he allegedly committed the crime, and (2) in failing to enter a mistrial when the prosecuting attorney in his opening argument to the jury remarked "that evidence is uncontradicted and uncontroverted," which was tantamount to a comment on the failure of the defendant to testify, and (3) in overruling his motion for a new trial, based on these alleged errors.

Under the plain provisions of Article 267 of the Code of Criminal Procedure, as amended and re-enacted by Acts 136 of 1932 and 261 of 1944, LSA–RS 15:267, the trial judge is vested with discretionary power to appoint (1) two disinterested physicians to "examine the defendant with regard to his present mental condition and to testify at the hearing", and (2) one or more disinterested physicians, not exceeding three, "Whenever on a prosecution by indictment or information, the existence of insanity or mental defect on the part of the defendant at the time of the alleged commission of the offense charged becomes an issue in the cause," and his ruling in this respect is never disturbed on appeal except where it has been manifestly abused. See, State v. Ridgway, 178 La. 609, 152 So. 307; State v. Eisenhardt, 185 La. 308, 169 So. 417; State v. Messer, 194 La. 238, 193 So. 633; State v. Washington, 207 La. 849, 22 So.2d 193; State v. Ledet, 211 La. 769, 30 So.2d 830; State v. Gunter, 208 La. 694, 23 So.2d 305; State v. Bessar, 213 La. 299, 34 So.2d 785; and State v. Davis, 214 La. 831, 39 So.2d 76.

The application for the appointment of a lunacy commission in the instant case gives a brief history of the accused who, at the time, was twenty-eight years old. The salient points seem to be that he is practically illiterate, and that because of a blow on his head, received when he was approximately nine years old, he still retains a scar, and that because of this injury he becomes "depressed and without the power to concentrate or to wholly govern his thoughts and actions."

◼ In his per curiam to the first bill of exceptions, the trial judge states that his refusal to appoint a lunacy commission was not only predicated on the fact that he did not feel these grounds were satisfactory or reasonable, being nothing more than a recital of information given his counsel by the defendant, but also on the fact that after he had interrogated the accused in his private chambers, in the presence of all counsel, his conclusion was that the appointment of such a commission was not warranted. Under these circumstances, we cannot say the trial judge has abused his discretion.

This leaves for our consideration the question whether the remark of the district attorney in his opening argument to the jury, to the effect that "that evidence is uncontradicted and uncontroverted," constitutes a prohibited comment.

◼ Under the well settled jurisprudence of this state, a comment by the prosecution with respect to the failure of the accused to take the stand constitutes reversible error, whether the comment is direct, or so phrased that the inference is plain. State v. Marceaux, 50 La.Ann. 1137, 24 So. 611; State v. Robinson, 112 La. 939, 36 So. 811; State v. Sinigal, 138 La. 469, 70 So. 478; State v. Lewis, 156 La. 985, 101 So. 386; State v. Broughton, 158 La. 1045, 105 So. 59; State v. Glauson, 165 La. 270, 115 So. 484; State v. Richardson, 175 La. 823, 144 So. 587; State v. Antoine, 189 La. 619, 180 So. 465; State

v. Davis, 214 La. 831, 39 So.2d 76; and State v. Hoover, 219 La. 872, 54 So.2d 130.

The state has argued very strenuously, however, both orally and in brief, that the remark was proper in view of the evidence adduced during the trial, and, as such, well within permissible bounds; that it was not intended to, and did not in fact, constitute, from any logical or reasonable interpretation, a prohibited comment, either directly or indirectly. In any event, that there is no constitutional inhibition against such comment, and, since the adoption of the Code of Criminal Procedure in 1928, no statutory prohibition.

In support of this view counsel call our attention to the fact that the commissioners who drafted this code stated, in their letter transmitting the draft to the then governor, it was their intention to eliminate "the law which forbids the district attorney and the judge to discuss and comment on the defendant's failure to testify," as well as the dicta in the case of State v. Davis, supra, that the expression in this letter, coupled with the history of the rule, furnishes "a logical argument for the contention that the rule does not exist in this state." [214 La. 831, 39 So.2d 81.]

The rule preventing the prosecution from commenting on the failure of the accused to testify in his own defense is but another of the many humane measures that were evolved to protect an accused from the oppressions abounding in the England

of a by-gone day, and has been said to be a by-product of the statutory abolition of the incapacity of an accused to testify in his own behalf and the constitutional privilege against self-incrimination. In order to appreciate this rule, therefore, the reason for its existence and its true significance is important.

The exemption from compulsory self-examination was the answer of freedom loving men to the abuses that grew out of the infamous inquisitorial oaths of the Ecclesiastical and Star Chamber courts that brought such terror to the hearts of men during the four hundred years that followed the reign of William the Conqueror. Originally designed to subject an accused to interrogation in order that the judge might be informed of the facts that were necessary to assist him in arriving at a decision, the practice of compelling a person to give evidence against, and actually convict, himself, was so misused during the centuries when England was torn by the vascillating struggle for papel and regal power that it degenerated, in time, into an inquisition under which answers were not infrequently elicited by threats, force, and torture. It came, ultimately, to signify an examination on mere suspicion, without prior presentment, indictment, or other formal charge or accusation. As Wigmore expresses it, by the middle of the 1600s it was nothing more than an "unlawful process of poking about in the speculation of finding something chargeable largely because of the headlong pursuit of heretics." By that time, too, the practice had been extended far beyond the ken of church affairs and laymen were being compelled to answer "ex officio" to penal charges. Eventually, it permeated the common law courts, where it became the usual practice to administer the oath in all preliminary proceedings as well as in trials proper, except those before a jury, in which cases the accused was tried on the oath of the juror rather than his own. Even in these cases, however, the accused was pressed and bullied into answering, subjecting himself, upon refusal, to unfavorable comment on the part of the judge that amounted to him telling the jury the accused would clear himself if he were not guilty.

By the middle of the seventeenth century this practice of forcing a person to convict himself became too abhorrent that its abolition, as well as that of the Ecclesiastical and Star Chamber courts, was forced under the Restoration inaugurated by the Stuarts, and the claim that no man is bound to incriminate himself—to disclose as a witness evidence against himself—was, for the first time, recognized by specific statute and conceded by the judges, although they were reluctant to forego the old habit of questioning and did not enforce the spirit as well as the letter of this bare rule of law for another half century.

The tragic farce of trials under these conditions, particularly when considered in the light of the fact that an accused was not represented by counsel and was con-

sidered incompetent to testify in his own behalf, is very graphically described by Sir James Fitzjames Stephen in his work on the History of the Criminal Law (page 325): "The prisoner, in nearly every instance, asked, as a favor, that he might not be over-powered by the eloquence of counsel denouncing him in a set speech, but, in consideration of the weakness of his memory, might be allowed to answer separately to the different matters which might be alleged against him. This was usually granted, and the result was that the trial became a series of excited altercations between the prisoner and the different counsel opposed to him. Every statement of counsel operated as a question to the prisoner, and indeed they were constantly thrown into the form of questions, the prisoner either admitting or denying or explaining what was alleged against him. The result was that, during the period in question, the examination of the prisoner * * * was the very essence of the trial, and his answers regulated the production of the evidence; the whole trial, in fact, was a long argument between the prisoner and counsel for the Crown, in which they questioned each other and grappled with each other's arguments with the utmost eagerness and closeness of reasoning."

This inquisitional procedure was, unfortunately, brought to this country by our early colonists, but it furnished a salutary lesson, for, as a result of the history of its abuse in England, as well as the personal experiences of the colonists with high handed prerogative courts, they incorporated the privilege against self-incrimination, as developed in our own history, in the Bill of Rights of the Constitution of the United States, and it has become one of the constitutional landmarks of America, where it is given sanction in all but two state constitutions—New Jersey and Iowa—and is there recognized by the courts to be in full force without the necessity of constitutional provision. It has been immovably fixed in every constitution of Louisiana since its inception as a state. Section 18 of Article VI of the Constitution of 1812; Article 107 of the Constitution of 1845; Article 103 of the Constitution of 1852; Article 105 of the Constitution of 1864; Article 6 of the Constitutions of 1868 and 1879; Article 11 of the Constitutions of 1898 and 1913; and Section 11 of Article I of the Constitution of 1921. For an excellent history of and treatise on the privilege against self-incrimination, its policy and application, see 8 Wigmore on Evidence (3d Ed.) beginning with Section 2250, at page 276. See, also, Twining v. New Jersey, 211 U.S. 78, 98, 29 S.Ct. 14, 53 L.Ed. 97, 105; Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223; In re Opinion of the Justices, 300 Mass. 620, 15 N.E.2d 662; State v. Wolfe, 64 S.D. 178, 266 N.W. 116, 104 A.L.R. 464.

It was only natural, therefore, that sooner or later, as civilization progressed and people in general became more enlightened,

that many reforms would result, such as the right of the accused to be tried by his peers, to assistance of counsel, and to be relieved of the compulsion to convict himself by his testimony. Finally, our lawmakers, in their wisdom, and realizing the fallacy of the reason for considering the accused to be incompetent to testify in his own defense—that he, being an interested party, would be incapable of answering truthfully—adopted laws relieving the accused of this incapacity.

In Louisiana, the legislature of 1886 (then called the General Assembly), by its adoption of Act 29, declared that "the circumstance of the witness being a party accused, shall in no wise disqualify him from testifying; provided, that no one shall be compelled to give evidence against himself," and provided further, "that his failure to testify shall not be construed for or against him". While this act was amended in 1902 and 1904, Acts 185 and 41 respectively, no changes were made that are pertinent here until the last above quoted language was changed by Act 157 of 1916, LSA–RS 13:3665, to provide that the defendant's "neglect or refusal to testify shall not create any presumption against him."

In the light of the history and background just above related, the many decisions of this court following the lifting of this incapacity in Louisiana, as well as in the vast majority of the courts of this country, have been to the effect that any comment on the defendant's failure to take the stand, either directly or by plain inference, constitutes reversible error.

The argument or contention of the state that because the legislature of 1928, in adopting the Code of Criminal Procedure, failed to include a specific provision restricting the right to comment, the prosecutor may, under our law, impute whatever inference he deems fit to the failure of the accused to testify, is untenable under the legislative history of the proposed draft of this code. While it is true, as the commissioners expressed in transmitting this draft to the governor for presentation to the legislature, it was their intention to eliminate the rule forbidding comment, and they made specific provision for such comment, the legislature refused to follow their recommendation.

We find that under the chapter dealing with the argument to the jury, these drafters included the following articles:

"Article 384. Counsel may argue to the jury both the law and the evidence of the case, but must confine themselves to matters as to which evidence has been received, or of which judicial cognizance is taken, and to the law applicable to the evidence; and counsel shall refrain from any appeal to prejudice, *but may comment upon the failure of the accused to testify.*

"Article 385. Counsel have the right to draw from the evidence received, *or from the failure of the accused to testify,* or from the failure to produce evidence shown to be in the possession of the op-

posite party, any conclusion which to them may seem fit, but counsel have no right to draw from such evidence or suppression of evidence an incorrect conclusion of law." (Italics ours.)

In enacting these as Articles 381 and 382 of the Code of Criminal Procedure, LSA–RS 15:381, 15:382, however, the legislature significantly eliminated the italicized portions above quoted. They obviously realized such provisions were entirely incompatible with the provisions to be found in Article 387, LSA–RS 15:387, where it is set forth that it is the duty of the judge to charge the jury "that every person accused of crime is presumed by law to be innocent until his guilt shall have been established beyond a reasonable doubt", and that it is the duty of the jury "to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the want of evidence in the case". Then, too, we think the legislature in its wisdom, presumably informed on the law and jurisprudence in existence at the time, was impressed with the beneficience of this rule and convinced that harm and prejudice might result from its elimination.

After a careful and exhaustive study of all of the arguments pro and con by eminent legal scholars and logicians, we are convinced that the better rule prevails in this state, which is in accord with the majority view; that it is not only sound, but that if such comment were to be permitted, it would, in effect, amount to an infringe-ment of the constitutional right of the accused to abstain from taking the witness stand or to give testimony in the trial of his own cause.

We are fortified in this view by the fact that in those states where comment obtains, experience has shown the defendant is, in fact, pressed to testify. It has also been found expedient, in most of the states where the prosecution is permitted to comment, even where permitted comment is made under specific constitutional amendment, to qualify this rule, as, for example, to prevent the state from availing itself of the inference to be derived from the defendant's exercise of his constitutional right to refuse to give compulsory testimony, until it has made out a prima facie case that calls for a reply. Additionally, it is generally recognized that if comment is to be permitted, the accused should be afforded additional protection by "restricting the scope of cross-examination to exclude references to the accused's criminal record." See the comment at 57 Yale Law Journal 145.

Wigmore himself points to the ever present danger of making legal guilt dependent upon anything short of proof from intrinsic evidence or voluntary confession by calling our attention to the fact that "The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power. The simple and peaceful process of questioning breeds a readiness to resort to bullying and to phys-

ical force and torture. If there is a right to answer, there soon seems to be a right to the expected answer, that is, to a confession of guilt. Thus the legitimate use grows into the unjust abuse; *ultimately, the innocent are jeopardized by the encroachments of a bad system.*" 8·Wigmore on Evidence 309, Section 2251. (Italics ours.)

This logic is, in our opinion, unanswerable, and in keeping with our concept of the protection that should be accorded an accused to insure that he receives the fair and impartial trial guaranteed him under our constitution, without compelling him to give evidence against himself. Any other view would indeed make the constitutional privilege against self-incrimination an idle gesture, for everyone accused of crime would be faced with the dilemma of being forced to either take the stand in his own defense or have an inference of guilt attach merely because he does not do so.

We think the import given the remark that "that evidence is uncontradicted and uncontroverted," by the trial judge in his per curiam, and which is to the effect that it was nothing more than an expression of the prosecution's appreciation of the evidence adduced during the trial, is in keeping with the jurisprudence of this court with respect to similar remarks, and from which no inference can be reasonably drawn that it was intended to allude to the defendant's failure to take the stand. See,

State v. Jack, 139 La. 885, 72 So. 429; State v. Varnado, 126 La. 732, 52 So. 1006; State v. Robertson, 133 La. 806, 63 So. 363; State v. Lewis, 156 La. 985, 101 So. 386; State v. Glauson, 165 La. 270, 115 So. 484; State v. Antoine, 189 La. 619, 180 So. 465; and 68 A.L.R. 1127.

It is unnecessary to pass on the ruling of the trial judge denying the defendant a new trial, for such motion was based upon the two errors just disposed of.

The conviction and sentence are affirmed.

HAWTHORNE, J., concurs in the decree.

HAWTHORNE, Justice (concurring).

I am in full accord with the holdings in the majority opinion in this case that the trial judge properly overruled the motion for the appointment of a lunacy commission, and that the remark of the district attorney did not constitute a comment on the defendant's failure to take the stand, and hence I agree that it was proper to affirm the conviction and sentence. That portion of the opinion, however, which states that, if such remark had been a comment on the failure of the defendant to take the stand, it would have constituted reversible error is nothing but dicta, with which, moreover, I do not agree.

I know of no reason why, in the absence of a statutory or constitutional prohibition, such a comment may not be made, now that the accused has the privilege of testifying

in his own behalf, which he formerly did not have. The question to my mind, then, is whether there is any such prohibition in the statutes or the Constitution of this state.

It is stated in the majority opinion that, "Under the well settled jurisprudence of this state, a comment by the prosecution with respect to the failure of the accused to take the stand constitutes reversible error, whether the comment is direct, or so phrased that the inference is plain". As authority for this statement numerous decisions are cited, the first being State v. Marceaux, 50 La.Ann. 1137, 24 So. 611, which announced the rule and is the basis thereof. Let us now examine the Marceaux case and see the basis and reasoning behind the holding therein.

The holding is based entirely upon the proposition that such a comment was prohibited by the provisions of Act 29 of 1886; or, in other words, that such a comment was prohibited by a statute of this state. Act 29 of 1886 was an act declaring the competency of witnesses in criminal proceedings, and, after providing that the circumstance of the witness being a party accused should in no wise disqualify him from testifying, further provided " * * * that his failure to testify shall not be construed for or against him * * *". In the Marceaux case the court held that the language of the statute, "failure [of the accused] to testify shall not be construed for or against him", constituted a prohibition "inferential and consequential, but strong and clear" [50 La.Ann. 1137, 24 So. 615] against any comment on the failure of the accused to take the stand.

Act 29 of 1886 was amended and reenacted by Act 185 of 1902, which in turn was amended and reenacted by Act 41 of 1904. The Legislature in 1916 adopted Act 157, which had for its object and purpose "To declare who shall be competent witnesses in civil and criminal cases", and which *expressly* repealed Act 41 of 1904. The 1916 act omitted the provision "that his [the defendant's] failure to testify shall not be construed for or against him", which was the basis of the opinion in the Marceaux case, but provided that the defendant's neglect or refusal to testify should not create any presumption against him.

In 1928 the Legislature of this state adopted the Code of Criminal Procedure, and Article 461 of that Code, LSA–RS 15:461, defines competent witnesses in any criminal proceeding. It provides in part: " * * * In the trial of all indictments, complaints and other proceedings against persons charged with the commission of crimes or offenses, a person so charged shall, at his own request, but not otherwise, be deemed a competent witness." It is significant that the provision in Act 29 of 1886 that the defendant's failure to testify should not be construed for or against him and the provision in the 1916 statute that the defendant's neglect or refusal to testify should not create any presumption against him were omitted therefrom. As the law

now reads, Code of Crim.Proc. Art. 461, LSA–RS 15:461, a person charged with a crime shall at his own request but not otherwise be deemed a competent witness.

Under these facts the basis of the Marceaux opinion no longer exists, and that case is not now authority for the rule as announced in the majority opinion. The same is true as to the other cases cited in the majority opinion which followed the rule as announced in the Marceaux case.

The conclusion is therefore inescapable that there is no statutory prohibition in this state against the district attorney's or the judge's commenting on the defendant's failure to take the stand.

It is true, as pointed out in the majority opinion, that, in the draft of the Code of Criminal Procedure made by the commissioners appointed to frame that Code, the right to comment on the failure of the accused to testify was expressly given. It is also true that the Legislature in enacting the Code omitted the express language giving such right which was found in the draft of the Code.

The language expressly giving the right was unnecessary and mere surplusage and was properly removed, for the reason that Article 461, which made the accused a competent witness at his own request but not otherwise, did not provide, as did the earlier statutes, that the failure of the accused to testify should not be construed for or against him, Act 29 of 1886, or that his neglect or refusal to testify should not create any presumption against him, Act 157 of 1916. By deliberately omitting from Article 461 these provisions which had been included in these previous acts, the Legislature abolished the statutory prohibition which had theretofore existed against any such comment, and in the absence of any statutory prohibition it was unnecessary for the Legislature to give the express right so to comment. If this is not true, why were these provisions, which were the basis of the rule, omitted? If it was the intention of the Legislature to prohibit any such comment, it could have very easily done so, just as our Legislature heretofore had done and as the Legislatures of some of the other states have done by statute.

The majority opinion says that such a comment violates the provision contained in Article 1, Section 11, of our Constitution, that "No person shall be compelled to give evidence against himself in a criminal case or in any proceeding that may subject him to criminal prosecution * *." So far as I can ascertain, this is the first time any such statement has been made by this court except in the recent case of State v. Hoover, 219 La. 872, 54 So.2d 130, in which the writer dissented. Not a single other decision of this court cited in the majority opinion to the effect that such a comment constitutes reversible error was based on the proposition that the defendant's constitutional guaranty against compulsory self-incrimination had been violated.

As I understand the majority opinion, it states that to permit such a comment would force anyone accused of a crime either to take the stand in his own defense or to have an inference of guilt arise merely because he does not do so; or, stated somewhat differently, that such comment would compel the accused to give evidence against himself in a criminal prosecution, in violation of Article 1, Section 11, of the Constitution.

The defendant in any criminal case has the right to testify or not, of his own volition, and, if he does not exercise the right so to testify, this probably will cause an inference of guilt to arise in the minds of the jurors regardless of whether any comment is made of this fact. Since the jurors have observed that the defendant has not testified, the inference is present whether any comment is made or not. How, then, does a mere comment on his failure to testify compel him to incriminate himself? Has he not voluntarily chosen not to testify, thus creating the inference by his own act, regardless of whether any comment is made? It is not the comment of the district attorney on the failure of the accused to testify which causes the inference of guilt to arise; it is the decision of the accused himself not to testify.

Counsel for the State quote in brief an extract from the case of State v. Cleaves, 59 Me. 298, 8 Am.Rep. 422, which we think is pertinent here: "It has been urged that this view of law places the prisoner in an embarrassed position. Not so. The em-

barrassment of the prisoner, if embarrassed, is the result of his own previous misconduct, not of the law. If innocent, he will regard the privilege of testifying as a boon justly conceded. If guilty, it is optional with the accused to testify or not, and he cannot complain of the election he may make. If he does not avail himself of the privilege of contradiction or explanation, it is his fault, if by his own misconduct or crime he has placed himself in such a situation that he prefers any inferences which may be drawn from his refusal to testify, to those which must be drawn from his testimony, if truly delivered."

I am therefore of the opinion that a comment by the district attorney on the failure of the accused to testify does not violate any provision contained in Article 1, Section 11, of the Constitution of this state.

Recently the Vermont Supreme Court upheld a statute authorizing the right to comment on the failure of the accused to testify. State v. Baker, 115 Vt. 94, 53 A.2d 53. That court took the realistic view that the constitutional guaranty protects the accused against the use of physical force or other forms of torture to compel him to testify, but not against moral coercion. The entire mechanism of the criminal trial, in my opinion, may be regarded as a form of psychological pressure directed toward eliciting testimony from the defendant.

Legal commentators generally are agreed that denial of the right to comment is detrimental to an efficient criminal procedure

and may serve to engender a disrespect for the law. See Model Code of Evidence, Rule 201 (1942); Dunmore, Comment on Failure of Accused to Testify, 26 Yale L. J. 464; Bruce, The Right to Comment on the Failure of the Defendant to Testify, 31 Mich.L.Rev. 226; Hadley, Criminal Justice in America, 11 A.B.A.J. 674, 677; Hiscock, Criminal Law and Procedure in New York, 26 Col.L.Rev. 253, 258–262; Storey, Some Practical Suggestions as to the Reform of Criminal Procedure, 4 J. Crim.Law and Criminology 495, 500–506. The Note in 57 Yale Law Journal, relied upon in the majority opinion as showing that experience in those states in which comment is allowed is unfavorable to it, on the contrary is to the effect that generally satisfactory results have been achieved in those states permitting comment, and that those results make a powerful argument in support of the right to comment. The note cannot be construed, in my opinion, as disfavoring the right.

For these reasons I respectfully concur.